

FILED
AUG 2 3 2022
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PHILLIP WINDOM OFFILL, Jr.<br>(a/k/a Jim Jimerson, James Jimerson, P. James Jimerson and Paul Jimerson)<br><br>and<br><br>JUSTIN WALLACE HERMAN,<br><br>Defendants. | ) | Case No. 1:22-CR-152<br><br>Count 1: 18 U.S.C. § 1349<br>(conspiracy to commit securities fraud and wire fraud)<br><br>Count 2: 18 U.S.C. §§ 1348 and 2<br>(securities fraud)<br><br>Count 3: 18 U.S.C. §§ 1343 and 2<br>(wire fraud)<br><br>Forfeiture Notice |

**INDICTMENT**

August 2022 Term – at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

**Introductory Allegations**

At all times material to this Indictment, unless otherwise stated:

Defendants

1. Defendant PHILLIP WINDOM OFFILL, JR. ("OFFILL") was a resident of Texas. OFFILL was formerly an attorney with the United States Securities and Exchange Commission (the "SEC"). As early as 2011, OFFILL was permanently barred from participating in offerings of "penny stock." Beginning in or around 2017, OFFILL participated in the creation and submission of false information and documents to conceal his role in the offering of "penny stock" MCPI, and to falsely make it appear that the transfer of MCPI shares to co-conspirators to

sell was legitimate. As part of the fraudulent conduct, and in order to conceal his true identity, OFFILL used the alias "Jim Jimerson," and variations on that name, including: "James Jimerson," "P. James Jimerson," and "Paul Jimerson," as well as the e-mail addresses: pjjimerson76@gmail.com and pjj@mansfieldmartin.com, among others.

2. Defendant JUSTIN WALLACE HERMAN ("HERMAN") was a resident of Pennsylvania. HERMAN also participated in the submission of false information and documents to fraudulently transfer shares of MCPI stock to his control. He then coordinated with others, including a call center, to fraudulently induce victim investors to purchase MCPI shares. Additionally, HERMAN worked with CC-2 to "match" investor purchases with HERMAN's own sales in an attempt to artificially support the price of MCPI while he sold his MCPI shares into the market.

Relevant Individuals

3. CC-1, a resident of Texas, participated in the submission of false information and documents to fraudulently transfer shares of MCPI stock to his control, which he attempted to sell to the public. CC-1 also transferred shares of MCPI stock to HERMAN when he could not deposit them in his own brokerage account.

4. CC-2, a resident of Florida, was a broker at a market-making firm. CC-2 agreed to "short" MCPI shares by selling them to investors and HERMAN would sell MCPI shares to CC-2 to "cover" CC-2's position. This type of "match trading" made the market for MCPI appear falsely to be more active than it was and concealed and disguised that HERMAN was behind the sales.

5. CC-3 was a resident of California. He operated a call center that made false statements to investors to attempt to induce them to purchase shares of MCPI.

6.      Individual 1, a resident of Texas, was the original owner of a company named MCPI, Inc. ("MCPI").

7.      Individual 2, a resident of Montana, was the CEO of Armada Mining, Inc. ("Armada") and after its reverse merger with MCPI, was the CEO of the resulting company named Mansfield-Martin Exploration Mining ("Mansfield").

Relevant Entities

8.      Armada was a privately-held Nevada corporation with its headquarters in Montana.

9.      MCPI was a publicly traded "shell" company that essentially had no operations, but had low-value common stock registered with the SEC.  OFFILL engineered a reverse merger between Armada and MCPI.  Following the merger, the combined company changed its name to Mansfield-Martin Exploration Mining.

10.     Mansfield was incorporated in Nevada and headquartered in Tombstone, Arizona. It had mining claims in Arizona and Idaho.  Until on or about August 27, 2019, Mansfield had a class of shares registered under Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"), which traded under the stock symbol MCPI.  The stock traded in the over-the-counter securities market rather than on a national securities exchange.  On or about August 27, 2019, the SEC suspended trading in Mansfield.  At all relevant times, MCPI stock had a value of less than five dollars and was a "penny stock" as defined by the federal securities regulations.

11.     Westgrove Partners, LLC ("Westgrove Partners") was originally incorporated in Wyoming in 2017.  OFFILL was an original owner of Westgrove Partners and opened a bank account in the name of Westgrove Partners in 2018 that he solely controlled.

Relevant Terms

12.     A "stock" is a type of investment signifying ownership in a corporation and represents a claim on the corporation's assets and earnings.  Stock is measured in shares that investors can buy and sell.

13.     "Microcap" stocks are stocks of publicly traded U.S. companies with a low market capitalization.  "Penny" stocks are typically stocks of publicly traded U.S. companies that trade for lower than $5 per share.

14.     The Over-the-Counter ("OTC") securities market is the equity market for securities not listed on a United States stock exchange, including the NASDAQ Stock Market. The OTC market was linked by computer networks, and quotations for OTC securities may have been quoted on listing services such as Pink Sheets.  The Pink Sheets was an inter-dealer electronic quotation and trading system in the OTC securities market.

15.     The SEC is an independent agency of the United States charged with enforcing the federal securities laws, which are designed to provide the investing public with full disclosure of all material facts involving the offer and sale of securities.

16.     In order for a company to offer or sell its securities to the public, federal securities laws required that the company first file a registration statement with the SEC or that the transaction be exempt from registration.  The requirement of a registration statement was designed, in part, to protect the general investing public by requiring detailed disclosures about a company's actual operations and financial condition.

17.     "Restricted shares" are shares or securities of a publicly traded company (known as an "issuer") that are not registered with the SEC and cannot be sold to the public.

18.     "Free-trading" shares are shares that are not restricted and can be sold or traded freely.

19.     Legal "opinion letters" generally represent the authority of the issuer to convert restricted shares into freely-traded ones.

20.     A "Stock Transfer Agent" is a company assigned by the issuer to maintain records of investors, account balances, and transactions, including, among other things, transactions pursuant to which restricted shares are converted into freely-traded ones. A transfer agent, acting on the direction of the company issuing shares, issues and cancels stock certificates to reflect changes of ownership. To satisfy these legal obligations, before transferring stock, transfer agents are required to attempt to ensure that the transfer is properly authorized by the transferor and determine whether the stock should bear a restrictive legend. Shares issued without a restrictive legend are immediately and freely tradeable, while shares with restrictive legends may have certain time and volume limitations as prescribed by the federal securities laws and/or the issuer.

21.     A "Broker" is any person who facilitates stock transactions for the accounts of others. A "Dealer" is any person engaged in the business of buying and selling securities for one's own account, through a broker or otherwise. A "Brokerage firm" is an entity that brings together buyers and sellers to facilitate a stock transaction.

22.     Before accepting certain stock for deposit into a customer's brokerage account, broker-dealers are required to conduct due diligence designed to ensure that the customer's acquisitions of the shares and any potential trades in the shares are consistent with applicable law.

23. The Financial Industry Regulatory Authority ("FINRA") is the self-regulatory organization for the securities industry operating under the authority of the SEC. FINRA regulates the activities of its members, which include member brokerage firms and registered employees of those firms.

24. In order for a company who trades its stock in the OTC market to be known under a new name in the marketplace, it must report the corporate name change to FINRA. After FINRA confirms the details of the name change, it then publishes it to brokers and other market participants. On receipt of corporate action requests submitted electronically by an issuer, FINRA does routine database searches of individuals making the request. Individuals submitting such information must certify whether any of the parties related to the company was the subject of pending, adjudicated, or settled regulatory action or investigation by a federal, state or foreign regulatory agency or self-regulatory agency, or a civil or criminal action related to fraud or securities laws violations.

<u>OFFILL's Penny Stock Bars</u>

25. As part of a prior civil case that the SEC brought against OFFILL, on August 19, 2011, the U.S. District Court for the Eastern District of Michigan entered a final judgment against OFFILL that permanently barred him from participating in an offering of penny stock, which included "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock."

26. As part of another civil case that the SEC brought against OFFILL, on April 10, 2012, the U.S. District Court for the Northern District of Texas also entered a final judgment against OFFILL that permanently barred him from participating in an offering of penny stock, which included "engaging in activities with a broker, dealer, or issuer for purposes of issuing,

trading, or inducing or attempting to induce the purchase or sale of any penny stock."

Overview of the Scheme

27. The fraudulent scheme involved MCPI and included the following components, among others:

a. OFFILL, HERMAN, CC-1, and others orchestrated the fraudulent transfer of millions of MCPI shares from the control of Individual 1 to HERMAN, CC-1, and entities under their control for little or no cost, and then profited by selling them to the general investing public;

b. To effectuate the transfer of MCPI shares, OFFILL, HERMAN, CC-1, and others provided Mansfield's stock transfer agent and brokerage firms with materially false information, including fraudulent consulting and stock purchase agreements and attorney opinion letters relying on them;

c. In order to conceal his true identity, including his two "penny stock" bars and a prior criminal conviction for fraud and securities laws violations for which he was on supervised release, OFFILL used variations of his false "Jim Jimerson" alias in materially false communications with FINRA, Mansfield's stock transfer agent, Mansfield's employees and contractors, and others;

d. HERMAN, CC-1, and others paid third parties to fraudulently market MCPI shares for sale, including by making materially false statements and omissions about Mansfield and the origins of the MCPI stock to potential investors over the phone;

e. HERMAN coordinated with CC-2, a registered broker employed by a market-making firm, to sell MCPI shares to the investing public. HERMAN and CC-2's "matched" trades made the market for MCPI stock falsely appear to be more active than it actually was; and

f. OFFILL, HERMAN, CC-1, and others shared the proceeds of the fraudulent MCPI stock sales while raising little or no money for Mansfield.

**Count 1**
**Conspiracy to Commit Securities Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

28. The allegations set forth in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

29. From at least in or around November 2016 through at least in or around October 2018, in the Eastern District of Virginia and elsewhere, the defendants PHILLIP WINDOM OFFILL, JR. and JUSTIN WALLACE HERMAN, did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit certain offenses against the United States, to wit:

a. Securities fraud, that is, to knowingly and intentionally execute a scheme and artifice (i) to defraud any person in connection with any security of MCPI, an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)); and (ii) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any security of MCPI, an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), in violation of Title 18, United States Code, Section 1348.

b. Wire fraud, that is, having knowingly devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitting and causing to be transmitted, by means of wire communications in interstate and foreign commerce writings,

signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

**Purpose of the Conspiracy**

30. It was the purpose of the conspiracy for defendants OFFILL and HERMAN and co-conspirators to unjustly enrich themselves by fraudulently causing the transfer of MCPI stock to the co-conspirators' control, and then to fraudulently sell those shares to the general investing public.

**Manner and Means of the Conspiracy**

31. In furtherance of the conspiracy, and to accomplish the unlawful objectives, defendants OFFILL, HERMAN and other co-conspirators known and unknown to the grand jury, used the following manner and means, among others:

The Reverse Merger of Armada and MCPI

32. Individual 2 sought out a publicly traded company with limited or no ongoing operations with which Armada could merge. The resulting company could then raise additional funds from investors through its publicly traded stock. Individual 2 engaged OFFILL to help Armada with this process, among other things.

33. Individual 1 controlled MCPI, a publicly traded company that at that time had no operations. Individual 1 expressed interest to OFFILL in selling a controlling interest of MCPI.

34. On or about November 28, 2016, MCPI entered into a reverse merger agreement with Armada to transfer MCPI shares to Armada in exchange for Armada's interest in potential mining properties in the Tombstone Mining District of Arizona. The agreement gave Armada approximately 85% ownership of MCPI upon the closing of the transaction. On or about March

14, 2017, the combined entity changed its name to Mansfield-Martin Exploration Mining, and traded under the MCPI stock symbol.

OFFILL Used the Alias "Jimerson" to Correspond with FINRA Regarding Mansfield's Name Change

35. As part of the process of changing its name, MCPI was required to inform FINRA of the change. OFFILL used his false name "Jimerson" in order to hide his true identity in materially false communications with FINRA regarding the corporate name change. For example, on or about February 28, 2017, OFFILL, falsely identifying himself as "Paul James Jimerson," submitted a company action notification notifying FINRA of the MCPI corporate name change. The notification falsely stated that Jim Jimerson was an employee of Mansfield who worked in "Corporate Services." In the notification, OFFILL also falsely denied that "any of the ... parties related to the company and/or company-related action" were "the subject of pending, adjudicated or settled regulatory action or investigation by a federal ... regulatory agency or self-regulatory organization; or a civil or criminal action related to fraud or securities laws violations."

36. That submission also included a certification statement signed electronically by OFFILL as "Paul James Jimerson," in which OFFILL falsely stated that "I hereby certify that the information disclosed in this issuer Company-Related Action Notification Form is accurate and true to the best of my information, knowledge and belief, and that I have all necessary authority to submit this form on behalf of the named issuer and to respond to communications related to this form."

37. Similarly, on March 13, 2017, OFFILL e-mailed FINRA using his "Jimerson" alias to confirm the accuracy of the corporate name change. OFFILL signed the e-mail "Jim Jimerson, Corporate Services."

38.     Offill's emails with FINRA were electronically transmitted to a data center which hosted FINRA communications located in Ashburn, Virginia, within the Eastern District of Virginia.

The Fraudulent Transfer of MCPI Shares to HERMAN and CC-1 for Sale to the Investing Public

39.     As part of the conspiracy, OFFILL fraudulently orchestrated the transfer of three separate multi-million share blocks of MCPI stock to HERMAN and CC-1's control for sale to the investing public. These shares were all originally under the control of Individual 1. As part of the fraud, OFFILL and HERMAN took control of these shares and did not pay Individual 1 the proceeds from their sale. By obtaining the MCPI shares at no cost, OFFILL and HERMAN were able to maximize their profits.

1.5 million MCPI Share Transfer

40.     As part of the conspiracy, OFFILL orchestrated the fraudulent transfer of 1.5 million MCPI shares from Individual 1 to CC-1. To help facilitate this transfer of shares, CC-1 executed a purported consulting agreement (the "consulting agreement") with Individual 1. The consulting agreement was backdated to March 1, 2016, and purported to provide for the engagement by Individual 1 of CC-1 to perform various consulting services, in exchange for 1.5 million MCPI shares. This agreement was fraudulent—CC-1 did not provide any such services and never intended to do so.

41.     On or around December 6, 2016, OFFILL, using his false "Jimerson" alias, e-mailed MCPI's transfer agent to request that the transfer agent, among other things, start the process of transferring 1.5 million MCPI shares to CC-1. This transfer was to be made pursuant to a partial conversion of an MCPI promissory note held by Individual 1. On or about January 19, 2017, CC-1 provided Mansfield's stock transfer agent with an attorney opinion letter stating

that under the relevant securities laws the MCPI shares were freely transferrable from Individual 1 to CC-1. The attorney opinion letter was purportedly based in part on the fraudulent consulting agreement.

42. Based in part on the attorney opinion letter, Mansfield's transfer agent issued 1.5 million shares to CC-1, who unsuccessfully attempted to deposit these shares with his broker. As part of the fraudulent scheme, HERMAN and CC-1 arranged to have these shares transferred to HERMAN's control because he had the ability to "clear" (i.e., deposit and then sell to the public) penny stocks through his broker.

43. To make the transfer of shares to HERMAN appear authorized and legitimate, HERMAN executed a fraudulent Stock Purchase Agreement (the "SPA") dated February 2, 2017 with CC-1. The SPA provided for the sale by CC-1 of 1.5 million shares of MCPI at a price of $.10/share (or $150,000 in total). HERMAN never intended to pay CC-1 $150,000 in connection with this transfer. In or around February 2017, CC-1 transferred the 1.5 million shares of MCPI stock to HERMAN, who successfully deposited them into his brokerage account. To falsely demonstrate that he obtained these shares legitimately, HERMAN provided his broker with a copy of the fraudulent SPA. On or about February 6, 2017, HERMAN e-mailed his broker to confirm the false share price listed in the SPA, and further fraudulently stated that the total cost was actually $.30/share. Over the next several months, HERMAN sold certain of these shares to the investing public for proceeds of approximately $146,000.

<u>15 million MCPI share transfer</u>

44. In or around April 2017, OFFILL facilitated the fraudulent transfer of an additional 15 million MCPI shares owned by Individual 1. On or about June 29, 2017, OFFILL, using his false "Jimerson" alias, emailed Mansfield's transfer agent a fraudulent share transfer

instruction form that indicated that Individual 1 wished to transfer the 15 million shares to HERMAN in a share sale transaction for consideration of $750,000 (or $0.05 per share). HERMAN never intended to pay Individual 1 $750,000 in connection with this transfer.

45. On or about July 11, 2017, Mansfield's transfer agent followed OFFILL's instructions and processed the transfer of Individual 1's 15 million MCPI shares to HERMAN's brokerage account. After depositing the fraudulently obtained shares into his brokerage account, HERMAN sold these shares to the public. Over the next several months, HERMAN realized proceeds of approximately $1.1 million from the sale of MCPI shares.

24 million MCPI share transfer

46. As a further part of the conspiracy, OFFILL orchestrated the fraudulent transfer of 24 million MCPI shares from Individual 1 to CC-1. To help facilitate this transfer, in or around October 2017, OFFILL drafted a Stock Purchase and Services Agreement ("SPSA") that provided for Individual 1 to sell to CC-1 24 million shares of MCPI stock in exchange for CC-1 providing cash and various capital raising-related services. This document was fraudulent—CC-1 never provided the payment or services to Individual 1 specified in the agreement, nor did he intend to do so.

47. On or around November 13, 2017, OFFILL, using his false "Jimerson" alias, e-mailed Mansfield's transfer agent to process the issuance of 24 million shares of MCPI stock to CC-1. As part of the request, OFFILL included a purported attorney opinion letter, which was based in part on the fraudulent SPSA, confirming the transferability of the MCPI shares to CC-1. On or about December 13, 2017, the transfer agent issued 24 million shares of MCPI stock to CC-1.

48. Between on or around December 26, 2017, and on or around January 31, 2018, CC-1 sold approximately 3.6 million of the 24 million shares of MCPI stock for proceeds of approximately $127,000. In or around April 2018, CC-1 also transferred approximately 6.5 million MCPI shares to HERMAN, and CC-1 continued to attempt to sell his remaining MCPI shares through at least October 2018.

The Issuance of False MCPI Press Releases

49. As part of the scheme, OFFILL caused materially false MCPI press releases to be publicly issued in an attempt to fraudulently support the demand for MCPI stock. As one example, on or about February 21, 2018, Mansfield issued a press release stating in part that Mansfield had entered into an agreement with "Westgrove Partners, LLC" to receive $3 million in funding to construct processing facilities on company-owned property. As OFFILL well knew at the time, this press release was fraudulent. Among other things, Mansfield had not reached any such agreement with Westgrove Partners, and OFFILL himself was affiliated with Westgrove Partners.

50. Similarly, on or about March 20, 2018, OFFILL knowingly caused Mansfield to issue a materially false press release stating in part that Westgrove Partners would be providing funding for Mansfield to make property purchases and claims. That press release was also fraudulent, as OFFILL well knew at the time. Mansfield did not have an arrangement with Westgrove Partners to provide any such funding.

Use of Phone Marketers to Fraudulently Create Demand for MCPI Shares

51. HERMAN and CC-1 paid other individuals to fraudulently market their MCPI shares to the general investing public. In part because selling large amounts of the thinly-traded

MCPI shares could take a long time or cause significant declines in the share price, HERMAN and CC-1 paid third parties to fraudulently solicit investors to purchase the shares.

52. Among other third parties, HERMAN paid CC-3, who ran a call-center in California. CC-3's call-center employees made phone calls to potential investors to solicit them to purchase shares of MCPI. As part of the fraudulent scheme, the call-center employees made a number of materially false representations and omissions to potential investors. Among other things, the call-center employees falsely told potential investors that Mansfield was actively trying to raise MCPI's share price to become listed on a national securities exchange, and that the call-center was working on behalf of Mansfield—not HERMAN. They also made materially false omissions to potential investors, including by failing to disclose that HERMAN was paying CC-3's call-center large commissions.

53. As part of the defendants' scheme, a number of investors, in the Eastern District of Virginia and elsewhere, purchased MCPI stock after being contacted by phone marketers who made materially false statements and omissions. These included, but were not limited to:

a) Investor M.G., in Williamsburg, Virginia, within the Eastern District of Virginia, purchased approximately 34,000 shares of MCPI in August 2017.

b) Investor W.B. purchased approximately 2,400,000 shares of MCPI in August and September 2017.

c) Investor R.H. purchased approximately 190,000 shares of MCPI in August and September 2017.

d) Investor W.H. purchased approximately 100,000 shares of MCPI in August through October 2017.

<u>Profitable Sales of MCPI Shares to Outside Investors</u>

54.     In total, as part of the fraudulent scheme HERMAN, CC-1, and others sold at least 19.5 million shares of MCPI to the investing public, for at least $1.3 million in proceeds. OFFILL, HERMAN, CC-1 and others divided the proceeds up among themselves, while raising little or no money for Mansfield.  As part of the scheme, OFFILL directed that certain of his proceeds be transferred to a Mansfield company bank account that OFFILL controlled.  OFFILL had sole signatory authority over it and treated it, at least in part, as his personal account. OFFILL made a number of personal expenditures from the account, including a partial payment for the purchase of a private airplane and transfers to a Westgrove Partners bank account under his control.  OFFILL also later falsely denied to Individual 2 that this Mansfield company bank account existed.

(In violation of Title 18, United States Code, Section 1349).

**Count 2**
**Securities Fraud**
**(18 U.S.C. § 1348)**

THE GRAND JURY FURTHER CHARGES THAT:

55.     The allegations set forth in Paragraphs 1 through 54 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

56.     From at least in or about November 2016 through at least in or about October 2018, in the Eastern District of Virginia and elsewhere, the defendants, PHILLIP WINDOM OFFILL, JR. and JUSTIN WALLACE HERMAN, did knowingly and intentionally execute a scheme and artifice (a) to defraud any person in connection with any security of MCPI, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)); and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of MCPI, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

(All in violation of Title 18, United States Code, Sections 1348 and 2).

**Count 3**
**Wire Fraud**
**(18 U.S.C. § 1343)**

THE GRAND JURY FURTHER CHARGES THAT:

57. The allegations set forth in Paragraphs 1 through 54 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

58. On or about the dates below, in Williamsburg, Virginia, within the Eastern District of Virginia, and elsewhere, defendants, PHILLIP WINDOM OFFILL, JR. and JUSTIN WALLACE HERMAN, having knowingly devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as set forth below, each such wire transmission being a separate count:

| Count | Approximate Date | Description of Interstate Wire |
|---|---|---|
| 3 | August 25, 2017 | Investor M.G's electronic submission of an order to his broker to purchase MCPI shares sent from Williamsburg, Virginia to a computer server for his broker located outside the Eastern District of Virginia. |

(In violation of Title 18, United States Code, Sections 1343 and 2).

**Forfeiture Notice**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE AS

DESCRIBED BELOW:

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendants PHILLIP WINDOM

OFFILL, JR. and JUSTIN WALLACE HERMAN are hereby notified that:

1.     If convicted of the conspiracy offense alleged in Count One, the securities fraud

offense alleged in Count Two, or the wire fraud offense alleged in Count Three, they shall forfeit

to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28,

United States Code, Section 2461(c), any property, real or personal, which constitutes or is

derived from proceeds traceable to the offense.

2.     The assets subject to forfeiture include, but are not limited to, the following: a

monetary judgment in the amount of not less than $1,350,000, representing the proceeds the

defendants obtained from the wire and securities fraud scheme.

3.     Pursuant to 21 U.S.C. § 853(p), defendants PHILLIP WINDOM OFFILL, JR. and

JUSTIN WALLACE HERMAN shall forfeit substitute property, if, by any act or omission of

defendants PHILLIP WINDOM OFFILL, JR. and JUSTIN WALLACE HERMAN, the property

referenced above cannot be located upon the exercise of due diligence; has been transferred, sold

to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been

substantially diminished in value; or has been commingled with other property which cannot be

divided without difficulty.

(All pursuant to Title 18, United States Code, Sections 981(a)(1)(C); Title 28, United States Code Section 2461(c); Title 2, United States Code, Section 853(p); and Federal Rule of Criminal Procedure 32.2.)

A True Bill

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

Date

Foreperson

Jessica D. Aber
United States Attorney

By: Kimberly R. Pedersen
Kimberly R. Pedersen
Assistant United States Attorney

Lorinda I. Laryea, Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:
Blake C. Goebel
Trial Attorney